IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| ANITA GAYLE JOHNSON, | ) | Civil Action No. 3:09-808-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District.  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff applied for DIB on December 13, 2004, alleging disability as of June 20, 2003. Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ").  After a hearing held April 4, 2008, at which Plaintiff appeared and testified, the ALJ issued a decision dated May 8, 2008, denying benefits and finding that Plaintiff was not disabled.  The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was twenty-eight years old at the time she alleges she became disabled and thirty-three years old at the time of the ALJ's decision.  She has a college education with past relevant work as a clinical counselor, records clerk, and cashier.  Plaintiff alleges disability due to

the residual effects of a motor vehicle accident, including post traumatic stress disorder

("PTSD");depression; and pain in her left arm, knees, and back.  Tr. 141-142.

The ALJ found (Tr. 17-28):

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since June 20, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: mild degenerative disc disease, mild degenerative joint disease, depression, and [PTSD](20 CFR 404.l520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant is restricted to lifting, carrying, and handling of no more than 20 pounds on an occasional basis and no more than 10 pounds frequently. [S]he is restricted to the performance of routine, repetitive tasks, as described in unskilled work, that is, work with a specific vocational preparation of 1 or 2 in the <u>Dictionary of Occupational Titles</u>: however, these unskilled work tasks must be performed in a work environment where [s]he is not required to come in contact with the general public in performance of the job duties and in a work environment which is at the lowest end of the stress scale in the world of work. [S]he can do no constant or repetitive jobs requiring reaching or overhead work but can frequently use the left upper extremity for reaching and overhead work.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on March 11, 1975 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has a college education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 20, 2003, through the date of this decision (20 CFR 404.1520(g)).

On January 30, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 5-7). Plaintiff then filed this action in the United States District Court on March 30, 2009.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## MEDICAL RECORD

On June 20, 2003, Plaintiff was injured when a pick-up truck turned in front of the motorcycle she was riding at a speed of 30-35 miles per hour. She was treated for approximately eight hours at

a trauma center for her injuries.  She underwent surgery to repair a fracture to her left elbow.  See Tr. 217, 221, 225, 227, 501-502.

On June 25, 2003, Dr. James Carr, an orthopedist, removed Plaintiff's elbow splint and noted good healing of her surgical wound.  He prescribed physical therapy (see Tr. 235-245, 441-448) and noted, "No work x 1 month - she is a clinical counselor and needs to be driving et cetera."  Tr. 233.

On July 2, 2003, Plaintiff was examined by Dr. William Felmly, an orthopedist, for complaints concerning her back.  Plaintiff reported that she was improving.  Examination revealed that Plaintiff had tenderness to palpation in her neck, back, and hips; giveaway weakness in her left arm; and pain when lying on her back.  Her sensation was intact, she had full muscle strength in her legs, she was able to raise on her heels and toes without difficulty, and she had no signs of nerve root irritation in her low back.  X-rays of Plaintiff's cervical spine were unremarkable and x-rays of her lumbar spine revealed "minimal to no" arthrosis.  Dr. Felmly noted that there was no evidence of structural changes in Plaintiff's back, and thought that her symptoms were likely due to myofascial (soft tissue) causes.  He recommended that Plaintiff perform range of motion exercises and continue her pain and anti-inflammatory medications.  Tr. 229-231.

On July 8, 2003, Plaintiff was examined by Dr. Kevin Nahigian, an orthopedist, for problems with her right foot and left knee.  Dr. Nahigian diagnosed Plaintiff with a right foot and ankle sprain and left knee pain with possible meniscal pathology.  He thought that Plaintiff should remain in a sit-down job for the time being and ordered an MRI of her knee.  Tr. 400-401.  The MRI revealed an anterior cruciate ligament (ACL) tear, joint effusion (accumulation of fluid), and bone bruises.  Tr. 412.

4

On July 10, 2003, Dr. Sale Estefano, a psychiatrist who had previously treated Plaintiff (in March and May 2001), noted that Plaintiff was having nightmares about her motorcycle accident, had developed PTSD, and was unable to work. He prescribed medication for anxiety. Tr. 342-343. He continued to see Plaintiff approximately every month or two from July 2003 and September 2004. Tr. 335-341. In his records, Dr. Estefano noted that Plaintiff developed PTSD from the accident, she was very depressed, she was afraid to sleep because she was having nightmares, she occasionally had panic attacks, and she complained of difficulty with memory and concentration. Tr. 335-341. During this time period, Dr. Estefano opined that Plaintiff was "still unable to return to work." Tr. 417.

Plaintiff also underwent chiropractic treatment, occupational therapy, and physical therapy after her accident. Tr. 250-277, 281-285, 433-437. On January 28, 2004, Plaintiff was treated in an emergency room and released with a diagnosis of panic attack. Tr. 438-440.

Dr. Nahigian continued to treat Plaintiff for her complaints of left elbow, right foot, and left knee problems. Tr. 401-404. His examinations revealed that Plaintiff had limited range of motion in her left elbow and that her progress had reached a plateau as of September 2003. Plaintiff's right foot problems were reportedly resolved by September 2003. Tr. 403. Plaintiff complained of back pain, but Dr. Nahigian noted in August 2003 that MRIs of her thoracic and lumbar spine were "completely negative." Tr. 402. Dr. Nahigian treated Plaintiff's left knee conservatively until December 2003, when he performed ACL reconstruction surgery. Tr. 246-249, 403-404.

Plaintiff had "excellent stability" in her left knee within a few weeks of surgery. In March 2003, Dr. Nahigian found that Plaintiff's knee was "completely ligamentously stable," she had full range of motion, and her left quadriceps strength was improving. Tr. 406. In March 2004, Plaintiff was noted to have continued limited range of motion in her left elbow. Tr. 407.

5

In an October 4, 2004 workers' compensation deposition, Dr. Estefano testified that he had seen Plaintiff on two occasions prior to her accident for major depression, recurrent and moderate, for which he had prescribed Prozac and psychotherapy with a social worker. Tr. 75. He reported that he saw Plaintiff every four weeks and her diagnoses after the accident were PTSD, depression, anxiety, and sleep problems. Tr. 77, 81. Dr. Estefano opined that her PTSD was caused by the accident and physical damage and her depression was due to pain and the inability to do the things she used to do. Tr. 77-78. He thought she needed psychotherapy and medications "just to be able to continue going." Tr. 78. He reported that he had not seen any progress in Plaintiff's conditions and that people with PTSD who had physical injuries were less likely to get better. Tr. 79. Dr. Estefano did not think that Plaintiff could function in a job because she had difficulty concentrating due to depression. Tr. 78-79. He thought that Plaintiff could not "deal with any pressure or making decisions in any job at the present time" and did not know how long, if ever, before she could do so. Tr. 82.

Dr. Estefano continued to treat Plaintiff monthly from October 2004 to June 2005. He noted that Plaintiff was very depressed, had nightmares, and had difficulty with concentration and memory. Between March and May 2005, he also noted that Plaintiff had "hallucinations" about car accidents and felt that workers' compensation investigators were following her. Plaintiff reported that she had gotten married. In June 2005, Plaintiff said she had four panic attacks during her deposition for workers' compensation. Tr. 330-334.

Plaintiff reportedly did not return to Dr. Nahigian again until April 5, 2005 (more than one year after her previous visit) because workers' compensation required her to change doctors. At that time, Plaintiff complained of left elbow pain and some mild persistent knee pain. Dr. Nahigian noted

6

that Plaintiff's ACL reconstruction was "excellent." Examination revealed that Plaintiff had trace effusion in her left knee, full range of motion, no instability, and a minimal deficit in her quadriceps strength. Plaintiff's left elbow was tender with some effusion, but her range of motion had improved somewhat. Dr. Nahigian injected Plaintiff's left elbow with Depo-Medrol and Marcaine. Tr. 407-408. He later administered a series of Synvisc injections in Plaintiff's left knee, but Plaintiff reported no improvement. Tr. 407-409. On July 12, 2005, Dr. Nahigian noted that Plaintiff was in "much better spirits" and had a "positive outlook." Plaintiff said she did not want to take any significant pain medication, and Dr. Nahigian recommended that Plaintiff continue strengthening and pool exercises. Tr. 409.

Dr. Mitchell Hegquist performed a consultative evaluation on July 22, 2005. Examination revealed that Plaintiff had a normal gait, intact neurologic status, limited range of motion and swelling in her left elbow, normal grip strength, and was able to perform fine and gross manipulations with her hands. Although she had tenderness in her knees, she had full range of motion, a stable knee joint, and good strength. Examination of her right ankle was unremarkable. X-rays of her left shoulder and low back were normal, x-rays of her right elbow were normal except for evidence of prior surgery, x-rays of her left knee showed some narrowing of the medial joint line with sclerosis and evidence of prior surgery, and x-rays of her right knee showed mild narrowing of the medial joint line. As to Plaintiff's mental state, Dr. Hegquist noted that Plaintiff had a somewhat flat affect, but was alert and oriented and had normal intelligence, behavior, and thought processes. Tr. 293-299.

Dr. Bonnie Ramsey, a psychiatrist, performed a consultative examination on July 27, 2005. Plaintiff complained of nightmares, hallucinations of people in cars coming toward her, depression,

and panic attacks which had lessened to once a week unless she was in a car or was reminded of her accident. She thought workers' compensation investigators were watching her and reported that she had trouble concentrating. Dr. Ramsey noted that Plaintiff had a history of alcoholism and cocaine use, but that Plaintiff stopped drinking alcohol and using drugs in September 1998. During the evaluation, Plaintiff cried, but was reportedly fully oriented. Plaintiff was able to recall three of three objects immediately and one out of three after five minutes; was able to subtract serial ones, threes, and sevens from 100; and had an average fund of knowledge. Plaintiff's reported activities were taking her dog out; watching television; occasionally cooking; light cleaning such as wiping counter tops, making her bed, and folding clothes; and visiting with friends. Dr. Ramsey diagnosed Plaintiff with PTSD, major depression, panic disorder and a Global Assessment of Functioning (GAF) score of 40 (indicting serious symptoms). Tr. 300-304. She concluded that Plaintiff was

> significantly limited in her ability to function secondary to severe [PTSD] symptoms and depression. She is also having panic attacks, although these have lessened on medication. Socially, she has been able to maintain relationships with several different friends, and had a good relationship with her husband, although she reports feeling very guilty that he has to take care of everything....Cognitively, she is having some problems with concentration, but should be able to take care of her finances with the assistance of her husband.

Tr. 303.

During July and August 2005, Plaintiff continued her treatment with Dr. Estefano. Tr. 329. On August 17, 2005, Dr. Samuel Goots, a state agency psychologist, reviewed the record and opined that Plaintiff was moderately limited in her abilities to maintain attention and concentration for extended periods, sustain a routine with special supervision, and complete a workweek at a consistent pace without interruptions from psychological symptoms. He thought that Plaintiff was "not significantly limited" in the remaining seventeen areas of mental functioning. Tr. 363-365.

8

In September 2005, Dr. William Crosby, a state agency physician, reviewed the record and opined that Plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently; sit and stand/walk about six hours each in an eight-hour workday; frequently push/pull, reach, and handle with her left arm; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Tr. 347-354.

In an October 5, 2005 workers' compensation deposition, Dr. Nahigian testified that he began treating Plaintiff in July 2003 for injuries she sustained in a motorcycle accident. Tr. 90-91. He said she initially had a left elbow injury, a "very bad [right] foot and ankle injury," and a "bad [left] knee contusion and injury." Tr. 91-92, 99-100. She later complained to him of right knee and back pain. Tr. 91-92. He performed surgery on her left knee in December 2003 and her knee stability drastically improved, but her sensitivity in the front part of her knee remained substantial. Tr. 92-93, 95. Dr. Nahigian said that Plaintiff still had problems with knee pain and swelling and her elbow continued to be painful and stiff. Her foot and ankle improved dramatically. Tr. 110. Dr. Nahigian opined that Plaintiff's knees had probably reached maximum medical improvement (Tr. 95-96); he might attempt to remove hardware from her elbow, but was unsure if that would help her symptoms (Tr. 97, 111-112); and he had concerns about her back and ribs, but these were not his area of expertise (Tr. 98, 104). He said she was on mild pain medication and would benefit from seeing a psychiatrist. Tr. 107, 109.

On October 11, 2005, Dr. Nahigian noted that Plaintiff was pregnant and complained of continued achiness in her knees and elbow and pain in her low back. Tr. 410. On October 17, 2006, x-rays of Plaintiff's right knee revealed well-maintained joint spaces. Dr. Nahigian diagnosed a probable chondral (cartilage) defect and prescribed a knee brace. Tr. 411.

On February 14, 2006, state agency physician Dr. Dale Van Slooten reviewed the records and opined that Plaintiff could perform a range of medium work limited to only frequent use of her left arm. Tr. 355-362. On February 15, 2006, state agency psychologist Dr. Renuka Harper reviewed the record and opined that Plaintiff had moderate limitations in handling detailed instructions and setting realistic goals, but was not significantly limited in the remaining seventeen areas of work-related mental functioning. Tr. 381-383.

Between September 2005 and January 2006, Dr. Estefano noted that Plaintiff was pregnant, was not sleeping well due to nightmares, and was having panic attacks. Tr. 328, 427. On February 7, 2006, Dr. Estefano testified in another deposition for worker's compensation. He opined that Plaintiff had PTSD because of the accident and may have had underlying major depression before the accident. Tr. 51. Dr. Estefano testified that Plaintiff was still having nightmares and pain, she had panic attacks, and she experienced hallucinations although she did not really become completely psychotic. Tr. 50, 54, 65-66. He said that Plaintiff could not take pain medication or her recommended psychiatric medications, other than Prozac, because she was pregnant. Dr. Estefano stated that he had seen "hardly any improvement" and opined that Plaintiff would need mental health treatment for a long time and may or may not improve. Tr. 53-55, 57-59. He explained that she was level to a point where she was not decompensating, but that she could decompensate in the future. Tr. 63. Dr. Estefano opined that Plaintiff's current psychiatric condition prevented her from employment. Tr. 56. He clarified that her condition prevented her from "any employment that she would have responsibility for making decisions or any stress." Tr. 56. Dr. Estefano recommended that Plaintiff apply for disability benefits because he did not think she could work at all and that she

would decompensate with any of the pressures of the job.  He further added that "[n]obody's going to hire somebody with that condition anyway."  Tr. 66.

In February and March 2006, Dr. Estefano noted that Plaintiff was still having nightmares and problems sleeping.  Tr. 427-428.  On May 11, 2006, he noted that Plaintiff had given birth and had handled her pregnancy well.  Tr. 428.  He reported that Plaintiff's complaints of depression, nightmares, and panic attacks continued through November 2006.  She reported situational stressors including a friend's attempted suicide, arguments with her husband, and problems getting workers' compensation to pay for her medications.  Tr. 429-432.

In January 2007 (after Dr. Estefano's death), Plaintiff began treatment with Dr. Randolph Scott, a psychiatrist.  Plaintiff's complaints to Dr. Scott were similar to her previous complaints, although she reported that her panic attacks had decreased.  Tr. 458-462, 478.  Dr. Scott noted on January 24, 2007 that Plaintiff had PTSD.  Tr. 458.   On March 28, 2007, he wrote that she continued to have chronic pain and she had memory problems.  Tr. 460.  He noted that her memory continued to deteriorate and asked that she be referred to a neurologist on September 6, 2007.  Tr. 462.  On January 7, 2008, Plaintiff reported to Dr. Scott that she hurt more in cold weather, had noticed some swelling, was awakened by nightmares, and her sleep was disturbed.  Tr. 478.

On April 23, 2007, Plaintiff was examined by Dr. Donald Johnson, II, an orthopaedist, for her back complaints.  She reported that her only pain medications were Aleve and Advil.  Dr. Johnson's examination revealed that Plaintiff had tenderness over her neck and low back with some limitations of motion, no muscle atrophy, and no neurological deficits.  MRIs revealed "mild" degenerative changes of Plaintiff's low back and a "mild" disc protrusion at C5-C6 in her neck.  He recommended an injection for her neck and physical therapy for her back.  Tr. 449-451.

11

Dr. Robert Deysach, a psychologist, performed a neuropsychological evaluation on April 25, 2007.  He noted that the purpose of his evaluation was to assess Plaintiff's cognitive and emotional functioning.  Tr. 452.  She reported that her helmet did not crack in the accident, she had been placed on "retirement disability," she was receiving workers' compensation payments, she had many pending lawsuits, and she did not see herself going back to work.  Tr. 454.

Dr. Deysach reported that a test to assess Plaintiff's efforts revealed that there was some likelihood of problem exaggeration which he thought could be a result of intentional memory malingering or a reduced awareness of a desire to display her belief that a true memory disorder was present.  Tr. 454.  Plaintiff scored generally in the average or well above average range on other tests of concentration and memory.  Tr. 454, 456.  Dr. Deysach explained that "Whatever the motivation, [her] poor performance [on memory testing] is likely associated with an underestimate on other psychometric measures of memory."  Tr. 546.  A personality assessment appeared to show that Plaintiff was exhibiting adequate candor.  Tr. 456.  On grip strength testing, Plaintiff was only able to pull 11 kilograms with each hand, but Dr. Deysach noted this might be due to residual arm injuries or possible antalgic behavior on her part.  Tr. 455.  Plaintiff's fine motor speed was within the expected range for adults her age, and she exhibited some difficulties in adaptive learning and signs of depression and anxiety.  Tr. 455-456.

Dr. Deysach thought that Plaintiff sustained a concussion in the accident, but that her PTSD symptoms were "more often linked to the psychological factors associated with a traumatic event than to physical brain trauma."  Tr. 457.  He noted that Plaintiff's performance was uneven on tests to assess adaptive learning and opined that this was possibly due to her:

> difficulty coping over time...In other words, factors of personal coping capacity along with persistent environmental factors...are likely in and of themselves to serve as

12

distracters [sic] sufficient to lead her to question her own abilities and demonstrate the periodic difficulties in concentration and memory that other have suggested might be evidence of brain damage.

Finally, it is reasonable that the concern itself about the presence of permanent damage to the brain as a result of her concussion has added to her uncertainty about [the] future and her capacity to manage. In light of the factors surrounding the accident (i.e., her use of a helmet which remained intact, her behavior in the hospital prior to discharge), her history of depression, her persistent pain and the ambiguity concerning the future, the findings of the present examination mitigate against a conclusion that neuropsychological dysfunction resulting from the physical effects of the head trauma are accounting for the changes in behavior noted by the patient and her husband. Although such a conclusion by itself is not likely to put her concerns to rest, it may help guide treatment to factors that may improve her adjustment in the future.

Tr. 457 (emphasis from original removed).

Carroll Crawford, M.Ed., CRC performed a vocational assessment on January 15, 2008. In his report, Mr. Crawford summarized Plaintiff's complaints, medical history, and work history. He noted that brain damage had been "ruled out' and that Plaintiff was able to maintain her home with the assistance of her husband and others. Plaintiff reportedly had to lie down two hours a day, which Mr. Crawford said prevented Plaintiff from seeking full-time work. Mr. Crawford concluded that it was expected that Plaintiff would "remain unavailable to the job market until [Plaintiff's] overall medical conditions improve." Tr. 463-466.

In January and February 2008, Plaintiff received treatment from Dr. Eleanya Ogburu-Ogbonnaya, a neurologist. Tr. 468-477. Nerve studies were noted to be abnormal due to possible segmental demyelination, but Plaintiff's EMG was normal. Tr. 479-485. Plaintiff's pain reportedly ranged from a 4 to 6 on a scale of 1-10 during these visits. Tr. 468-477. In a letter dated February 26, 2008, Dr. Ogburu-Ogbonnaya wrote that she had been treating Plaintiff for headaches and post-concussion syndrome. She also wrote that she treated Plaintiff for post laminectomy

syndrome, but there is no evidence in the record that Plaintiff ever underwent a laminectomy or other spinal surgery.  Tr. 477.

Plaintiff underwent a PET scan on February 19, 2008 which revealed "hypometabolism involving the medial portions of the temporal lobes which can be seen with short term memory loss." Tr. 467.  On April 4, 2008, Dr. Ogburu-Ogbonnaya completed a questionnaire from Plaintiff's attorney indicating that the PET scan showed physical brain damage that was more than likely caused by the motorcycle accident.  She also opined that the brain damage was a factor in Plaintiff's problems with memory and anger control.  Tr. 486.

## REPORTS AND HEARING TESTIMONY

Plaintiff reported, in a Daily Activities Questionnaire she completed on March 10, 2005, that she had pain and memory problems and required help from family members.  She wrote that she did laundry, swept, and mopped once a month; wrote checks for bills; shopped with her mother or boyfriend; visited with friends; went out to eat with friends about once a month; and drove a car.  Tr. 169-172.

In a May 2005 telephone interview with a disability representative, Plaintiff said that she had problems with her left arm, both legs, and her back.  She walked without a crutch, but limped. Plaintiff reported that she normally could walk a block without severe problems.  She reported that she had panic attacks, but they were usually controlled by medication or by allowing the attack to pass. She was scared to drive, but did so.  The employee noted that Plaintiff spoke clearly, organized her thoughts well, and communicated without apparent difficulty.  Tr. 173.

At the hearing before the ALJ, Plaintiff described her 2003 accident.  Tr. 502.  She said she hit her head on the truck at around 30 to 35 miles an hour.  She showed the judge her broken helmet.

Tr. 502. Plaintiff reported that she stayed in the hospital for eight hours. As a result of the accident, she had a crushed left elbow which was painful and held together with wires. She said she injured both knees, but her left knee was worse and required an ACL reconstruction that "did not heal the way it was supposed to." Tr. 502-504. Plaintiff also testified that she injured her back. Tr. 504. She said she previously had problems with depression and had been undergoing more regular mental health treatment since the accident. Tr. 505-506. Plaintiff said that a PET scan showed "structural brain damage" and that it took a long time to get the scan because workers' compensation would not allow it. Tr. 507.

Plaintiff testified that she had a substantial amount of pain daily and took medications that made her sleepy. Tr. 507-508. She said she had nightmares; daily periods of anger; and problems with sleep, memory, and concentration since the accident. Tr. 508-510. Plaintiff testified that she received help from family members since the accident. Tr. 510. She said she tried to do housework, but had difficulty due to pain. Tr. 509. She was able to change her child's diapers. Tr. 511. Plaintiff reported that she needed to lie down during the day because nightmares interrupted her sleep. She thought her worst pain was in her back and legs, but said she also had pain in her elbow and ribs. Plaintiff said she had "bad" panic attacks about once a week and more manageable ones about twice a week. Tr. 515. Plaintiff said she could not work as a counselor. Tr. 509.

Plaintiff's seventeen year old nephew also testified at the hearing. He lived with Plaintiff, Plaintiff's husband, and Plaintiff's child. Plaintiff's nephew said that he spent every day with her (he was home schooled) and had seen changes since the accident including that she was not as active, got depressed, did not sleep very well, and was sad because she could not do the things she used to do. He said that she was in pain a lot in her elbows, knees, and back. Plaintiff's nephew reported

15

that Plaintiff sometimes tried to do a load of laundry, wash dishes, or vacuum, but often did not complete the tasks because of pain. Additionally, he stated that he helped Plaintiff with her almost two year old child and that his uncle did most of the housework. Tr. 496-499.

## DISCUSSION

Plaintiff alleges that the ALJ erred because he: (1) failed to properly evaluate the opinions of Plaintiff's treating psychiatrists; and (2) failed to properly evaluate Plaintiff's credibility. The Commissioner contends that the determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence[1] and free of legal error.

A.      Treating Physician

Plaintiff alleges that the ALJ erred in dismissing Dr. Estefano's opinion that Plaintiff was unable to work and would decompensate in a work situation. She also argues that the ALJ erred by dismissing "the opinion and record of Dr. Randolph H. Scott whose notes mirrored those of Dr. Estefano." Plaintiff's Brief at 6. The Commissioner contends that the ALJ properly evaluated Dr. Estefano's opinion and did not err in discounting the opinion to the extent that Dr. Estefano thought that Plaintiff's impairments precluded her from working.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[1]Substantial evidence is:
evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."
Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

16

inconsistent with the other substantial evidence in the record.  See 20 C.F.R.§§ 404.1527(d)(2) and 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).  Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527.  Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p.

The ALJ's decision to discount Dr. Estefano's opinion of total disability is supported by substantial evidence.  The ALJ reasonably considered the medical opinions of Dr. Estefano and incorporated most of Dr. Estefano's opinions into his residual functional capacity findings.  The ALJ found that Dr. Estefano's treatment notes and deposition testimony supported Plaintiff's allegations of severe mental problems (Tr. 24) and concluded that these impairments precluded her from performing her past skilled work.  He further found that these notes and testimony supported the findings that Plaintiff was capable of meeting only the very low demands of unskilled work, could

not work with the public, and could only perform jobs at the lowest end of the stress scale (see Tr. 18, 25).

The ALJ properly discounted Dr. Estefano's opinion in part because it was not supported by Dr. Estefano's own testimony and treatment notes.  The ALJ noted that Dr. Estefano's treatment notes from July 2003 to November 2006 showed that Plaintiff's symptoms were well controlled and stable both with and without medications and that she required follow up only on a monthly basis. Tr. 21 and 24.  In his deposition, Dr. Estefano testified that he did not think Plaintiff could work, but also said that she could not perform employment that required responsibility for making decisions or caused stress.  As noted above, the ALJ took this into account by limiting Plaintiff to unskilled work (work with a 1-2 specific vocational preparation) at the lowest end of the stress scale with no public contact.  Dr. Estefano also testified that Plaintiff had not been able to take most of her medications because she was pregnant, but also said that Plaintiff had been level for two years (Tr. 63). Tr. 21.

The ALJ's decision is also supported by the mental status examination performed by Dr. Hegquist as part of his physical evaluation that revealed that although Plaintiff had a somewhat flat affect, she was alert and oriented with normal-appearing intelligence, normal behavior, and normal thought processes (Tr. 296).  In a report of contact, it was noted that Plaintiff spoke clearly, organized her thoughts well, and communicated without apparent difficulty.  Tr. 173.

The ALJ also discounted Dr. Estefano's opinion of total disability because Dr. Estefano did not evaluate Plaintiff's credibility.  An ALJ may accord less weight to a treating physician's opinion that is based largely upon a claimant's self-reported symptoms.  See Mastro v. Apfel, 270 F.3d at 178.  As discussed below, the ALJ's decision to discount Plaintiff's credibility is supported by

18

substantial evidence.  Plaintiff's daily activities also support the ALJ's decision to discount Dr. Estefano's opinion.

The ALJ's decision to discount Dr. Estefano's opinion in part based on testing by Dr. Deysach is supported by substantial evidence.  Dr. Deysach's testing revealed that there was a "likelihood of problem exaggeration" on tests designed to"assess effort by presenting a deceptively easy memory task diagnosing possible symptom exaggeration" (Tr. 454) and that "she performed in a manner suggesting her performance reflected a minimal estimate of her ability" (Tr. 464).  See, e.g., Stacy v. Chater, 70 F.3d 1263, 1995 WL 691954 at *3(4th Cir. 1995)(unpublished)("The ALJ did not make a medical judgment nor exceed his authority.  Instead the ALJ, just as any reasonable unbiased factfinder, gave a plain meaning to the phrase 'exaggeration of symptomatology' and rationally concluded that there was a possibility that Stacy was malingering or faking his symptoms.").

The ALJ's decision is also supported by the opinions of the state agency psychologists.  See 20 C.F.R. § 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians and psychologists]... regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion of nonexamining sources at the [ALJ] and Appeals Council levels of administrative review.").

Contrary to Plaintiff's argument, the ALJ did not err in dismissing the opinion of Dr. Scott. Importantly, Dr. Scott did not issue any medical opinion as to Plaintiff's limitations, such that there was not an opinion by Dr. Scott that was dismissed by the ALJ.  Additionally, Dr. Scott's treatment notes merely reflect that Plaintiff complained of symptoms of PTSD and depression symptoms. These treatment notes are not necessarily inconsistent with the ALJ's finding that Plaintiff was

19

limited to unskilled work with very low mental demands, no interaction with the public, and work at the lowest end of the stress scale. Dr. Ramsey's report, that merely stated that Plaintiff was "significantly limited" due to PTSD and depression is not from a treating physician and is also not inconsistent with the limitations found by the ALJ. Dr. Hegquist's report, stating that Plaintiff had a mental disorder and should seek psychiatric treatment, is also not from a treating physician and is not inconsistent with the ALJ's findings.

B.    Credibility

Plaintiff alleges that the ALJ erred in evaluating her credibility in finding that her credibility was "diminished based on his single purpose application of the clinical findings by an examining neuropsychologist [Dr. Deysach] hired by Ms. Johnson's adversary in her workers' compensation case." Plaintiff's Brief at 8.[2]  The Commissioner contends that the ALJ reasonably evaluated Plaintiff's credibility, in part, on tests showing evidence of malingering. Additionally, the Commissioner argues that the ALJ's decision to discount Plaintiff's credibility is supported by the medical record and Plaintiff's activities of daily living.

_____

[2]Plaintiff also argues that the ALJ failed "to recognize the multitude of serious injuries to the Plaintiff" including her arm injury, destruction of the ACL ligament, damage to the right leg, permanent damage to her ribs, permanent back injury, physical brain damage, and post traumatic stress disorder. Plaintiff's Brief at 11. Contrary to Plaintiff's argument, the ALJ did consider all of these impairments. See Tr. 18-26. There is evidence in the record that showed that Plaintiff's right foot had healed by September 2003 (Tr. 403); she regained stability, range of motion, and strength in her left knee shortly after her December 2003 surgery (Tr. 405-407); in 2005, x-rays of Plaintiff's right knee showed only "mild" narrowing and x-rays of her left elbow were unremarkable except for evidence of her prior surgery (Tr. 296-297); the first series of MRIs of Plaintiff's spine were negative (Tr. 402); and later MRIs showed only mild findings (Tr. 451). Although Plaintiff had some limitation of motion in her left arm and back, she retained a normal gait, normal grip strength, a normal neurological status, and the ability to perform fine and gross manipulation with her hands. See Tr. 173, 296, 406, 407, 409.

20

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a claimant's subjective complaints of pain, along with all of the evidence in the record.  See Craig v. Chater, 76 F.3d at 591-92; Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994).  Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers.  A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ properly considered Plaintiff's credibility by using the two-part test outlined above and considering the medical and non-medical record.  The medical record, as outlined above, supports the ALJ's conclusion that Plaintiff could perform a range of light, unskilled work.  The ALJ also properly referenced Plaintiff's activities in discounting Plaintiff's testimony that she could not perform any work.  These activities are indicative of her ability to perform the minimal demands of unskilled and low stress work with no public contact.  As the ALJ noted, the record showed that Plaintiff could do laundry, sweep, and mop once a month; had a good relationship with her husband; could go out to eat with friends once a month; visited with friends; drove; cared for her dog; cooked occasionally; did light housecleaning (including making the bed, wiping counters, and folding clothes); and cared for her young (less than two years old at the time of the ALJ's hearing) child.

21

The ALJ, in discounting Plaintiff's credibility, also properly considered that Plaintiff generally required only mild pain medications.  See, e.g., Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) (expressing approval of ALJ's consideration of a plaintiff's lack of strong pain medication); see also 20 C.F.R. § 404.1529(c)(3)(listing "other evidence" to be considered when "determining the extent to which [claimant's] symptoms limit [claimant's] capacity for work," including, "(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]").    Plaintiff declined to take strong pain medications in July 2005.  Tr. 409.  Dr. Nahigian testified in October 2005 that Plaintiff was only taking mild pain medications. Tr. 109.  In April 2007, Dr. Johnson noted that Plaintiff's only pain medications were Aleve and Advil.  Tr. 449.    The ALJ also discounted Plaintiff's credibility because of her noncompliance with physical therapy - not performing exercises as instructed and not using crutches.   Tr. 23.  See Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir. 1993); 20 C.F.R. § 404.1530(a) and (b).

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence.  This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra.  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock

<u>v. Richardson</u>, <u>supra</u>.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. <u>Shively v. Heckler</u>, <u>supra</u>.  It is, therefore,

RECOMMENDED that the Commissioner's decision be **affirmed**.

Joseph R. McCrorey
United States Magistrate Judge

January 13, 2011
Columbia, South Carolina